## Case No. 7,153.

In re JACKSON IRON MANUF'G CO.

[15 N. B. R. 438;[1] 2 Mich. Lawy. 435; 2 Cin. Law Bul. 154, 157.]

District Court, E. D. Michigan. April 25, 1877.

[1] [Reprinted from 15 N. B. R. 438, by permission.]

Hibbard & Lothrop, for petitioners.
John D. Conely, for the assignee.

BROWN, District Judge. There can be no doubt that the chattel mortgage in question was out of the usual and ordinary course of business of an iron manufacturing company, and therefore prima facie a fraud upon the bankrupt act. Rev. St. § 5130. Nor do I think the petitioners have rebutted this presumption of a preference. At the date of the mortgage the debts of the company amounted to about $25,000. Its assets, including unpaid subscriptions to the capital stock, the amount of which is not stated, were $33,000. While it does not positively appear that the notes given to Hibbard and Fritz were overdue, though given five months before, it does appear that six suits, involving over $10,000, had already been commenced against the company; that the mortgagees were both directors and were fully informed of its financial condition. I think I am bound to infer, as a matter of fact, that the company was not paying its debts in the ordinary course of its business, and was insolvent; that the mortgagees had reasonable cause to believe it so, and that the transaction was a preference, unless it can be supported upon the theory of a prior agreement to give the mortgage. As the mortgage was given less than four months before the commencement of proceedings in bankruptcy, it falls within the inhibitions of section 35 [of 1867 (14 Stat. 534)]. It was provided by section 10 of the act of June 22, 1874 [18 Stat. 180], changing the time mentioned in section 35 from four to two months, that this provision should not take effect until three months after the passage of the act. As the mortgage was given in October, 1873, the claim that it was affected by the amended act cannot be supported. There is, undoubtedly, authority for the proposition that a conveyance which would otherwise be a preference may be supported if given in pursuance of a former valid agreement. The general doctrine is stated in Cook v. Tullis, 18 Wall. [85 U. S.] 322, that an exchange of values may be made at any time though one of the parties to the transaction be insolvent. To the same effect are Sawyer v. Turpin, 91 U. S. 114; Clark v. Iselin, 21 Wall. [88 U. S.] 360; Watson v. Taylor, Id. 378. In the application of this principle it is immaterial whether there be simply an exchange of legal securities, or whether the security be given in pursuance of a prior agreement, performance of which may be enforced in equity. The English cases are numerous, and transactions of this nature have been frequently supported. In Hutton v. Cruttwell, 1 El. & Bl. 15, a trader, being indebted in £200 to a third party, agreed with the defendant that on defendant paying the amount, she (the trader) would assign by bill of sale all her effects to defendant to secure him. A deed of assignment was executed some months afterward, containing a power to defendant to enter and sell the property and repay himself. Afterward the trader, who had remained in possession, sold the property herself, and paid the £200 to defendant. Becoming bankrupt, her assignee sued defendant to recover the amount. The jury having found that the deed was not executed with intent to defeat or delay creditors, and the payment not made in contemplation of bankruptcy, the court held that the transaction was as if the deed had been executed at the time of payment by defendant to the creditor, which constituted a good consideration between the trader and defendant. It does not appear whether the agreement to assign was in writing or not, but the sale was to include all the trader's effects. In the case of Harris v. Rickett, 4 Hurl. & N. 1, the bill of sale was supported as having been executed in pursuance of a former agreement. In Ex parte Fisher, 7 Ch. App. 636, it was held that where a sum of money is advanced upon faith of a promise by the debtor to give a bill of sale of his property, the sum so advanced is to be considered as advanced upon the security of the bill of sale, but in such case the promise must be an absolute one. A trader had applied to a creditor who had previously advanced him £600 for a further advance of £100, which was accordingly made, on the debtor giving

a conditional promise that if he did not repay the £100 within ten days he would make an assignment of all his property to the creditor, to secure both the past and fresh advance. Default was made in payment, and the assignment was executed. It was held an act of bankruptcy and void against creditors. In delivering the opinion the court observes: "Although we do not dispute the rule that where a sum of money is advanced on the faith of a promise that a bill of sale shall be given, such sum is to be treated as a present advance on the security of a bill of sale, we do not think this rule will protect transactions where the giving of the bill of sale is purposely postponed until the trader is in a state of insolvency, in order to prevent the destruction of his credit, which would result from the registering of a bill of sale. * * * We are of the opinion that, if we were to hold this bill of sale to be valid, we should practically abrogate the rule that the assignment of the whole of a debtor's effects in consideration of a past debt is an act of bankruptcy, and should in every case enable a favored creditor, who can trust his debtor to give him a bill of sale of all his property when required, to obtain payment of his debt in full, to the prejudice of the other creditors." See, also, Ex parte Cohen, 7 Ch. App. 20; Ex parte Izard, 9 Ch. App. 271; Wadsworth v. Tyler [Case No. 17,032]; Ex parte Hodgkin, L. R. 20 Eq. Cas. 746.

In all these cases, however, the instrument was executed in pursuance of a prior agreement, which could have been enforced by a bill for a specific performance, so that there was in reality no additional security whatever. There are a few later English cases which seem to extend the doctrine still further, and to hold that every security or payment made in pursuance of a prior general promise to secure or pay is not a fraudulent preference within the meaning of the act. In Ex parte Kevan, 9 Ch. App. 752, a manufacturer being pressed for payment by a creditor, in August, 1872, promised to send £2,350 on account of the debt. On the 4th of November he sent bills amounting to £4,000 or £5,000 to the creditor, who received the proceeds and applied the £2,350 toward the debt. The manufacturer was at that time in insolvent circumstances, and on the following day committed an act of bankruptcy. It was held not to be a fraudulent preference, apparently upon the theory that, although it appeared the manufacturer could not, at the time when payment was made, pay all his debts out of his own money, it did not appear that he had at that time any immediate intention of stopping. It is true the court incidentally remarks: "It is difficult to say that any part of this payment was a fraudulent preference, because, as to the £2,350, it was a payment in pursuance of a previous agreement, and it is the same as if it had been paid in August, when the agreement was made, at which time Crawford had no thought of stopping." But, from the conclusion of the opinion, the case appears to have been decided really upon the ground that the creditor received the payment bona fide for a valuable consideration, and with no notice of the insolvency of the debtor. If the payment in this case were supported upon the ground of prior promise to pay, there would be an end of fraudulent preferences. No preference is ever made, except in pursuance of a prior promise to pay. The idea of a preference implies a pre-existing debt, which the debtor is bound and has in law promised to pay. The theory of the bankrupt law is that he shall not be permitted to fulfil promises of this kind, made to one creditor, in preference to those made to his other creditors, and as observed by Judge Hall, in Graham v. Stark [Case No. 5,676]: "The maintenance of the doctrine contended for would defeat the purposes of the bankrupt act."

I find the modern English doctrine on the subject of fraudulent preferences tersely stated by Vice-Chancellor Malins, in Smith v. Pilgrim, 2 Ch. Div. 127, in the following language: "Having now occasion to consider the law of fraudulent preference, and having had on many other occasions to look into the authorities, I am bound to say it is in a state of very considerable difficulty. There is no absolute rule; its application must depend upon the circumstances of each particular case. But to this extent it now seems to be clearly settled, and by all the authorities. A debtor must not of his own mere motion, without pressure or application, give a security to a creditor on the eve of bankruptcy, and if he does, that is a fraudulent preference. But if there be any pressure or negotiation for a security on the part of a creditor, then the fact that the creditor knows the debtor to be in embarrassed circumstances is no objection to the validity of the security." He also quotes with approbation the following language from the opinion of Lord Romilly, in Johnson v. Fesenmeyer, 25 Beav. 88: "If a man is insolvent, and disposes of a portion of his property in favor of a bona fide creditor, although upon the eve of bankruptcy, and although this fact be known or believed by both parties, it may be a perfectly valid and legal transaction. To render it invalid, there must be a disposition on the part of the insolvent to favor that particular creditor, and this is generally shown by the fact that the first step or proposal toward the disposal of the property in favor of that creditor proceeds from the insolvent debtor; but if the creditor, although he knows the debtor is insolvent, presses and insists upon having a security for his debt, and the debtor yields to that pressure, and gives the security, although it may be well-known to both at the same time that the effect will be to give that particular creditor an advantage over the

other creditors of the insolvent, the transaction, in my opinion, is perfectly good and valid." It is hardly necessary to say that this language is wholly inapplicable to our bankrupt system. The current of authorities is uniform, that if the knowledge of both parties of a present or an approaching insolvency be shown, the intent to prefer is presumed from the fact of preference, and the element of pressure on the part of the creditor plays no part in the transaction. As a matter of fact, preferences are rarely given, except under pressure, and the debtor is presumed to act voluntarily, if he yields to unlawful solicitation. Indeed, the American cases lend no countenance to the loose doctrines laid down in the recent English cases. In Arnold v. Maynard [Case No. 561], the court remarked respecting a mortgage given as a preference: "It is wholly immaterial whether the mortgage was voluntary or spontaneous on the part of the mortgagor, or was given on the request or demand of the mortgagee, or upon a verbal promise made in general terms, when the debt was contracted, to give security upon request, if at the time of the giving of the mortgage, the mortgagor knew that he was insolvent, and could not further continue his business, but must stop the same, and he intended by such mortgage to give a preference." The facts of the case are not given, but the law is stated, as I understand it, in the words above quoted.

In Graham v. Stark [supra], it was urged that certain securities were not void, because the bankrupt long before the securities were given, and at the time of the loans, promised to give security when required, and executed the mortgages in fulfilment of such promise under pressure from the mortgagees. It was held this position could not be maintained, and the court very pertinently remarked: "The provisions of the bankrupt act embrace payments for the purpose of giving a preference, as well as the giving of securities, etc., and it would hardly be contended that a preference by way of payment, otherwise invalid, would be valid because the debtor had agreed to pay the debt at the time it was contracted." In Blodgett v. Hildreth, 11 Cush. 311, it was held that the insolvent law of Massachusetts excluded any executory agreement for the giving of security between a debtor and creditor. It is true, the statute was more stringent than the corresponding section of the bankrupt law. And I should not feel justified in saying, following this opinion, were the question directly presented, whether a security could not be sustained if given in pursuance of a direct promise made at the time of the advance to give the particular security afterward executed. The question is somewhat discussed in Ex parte Ames [Case No. 323], and, although the facts are not fully given, Judge Lowell intimates the opinion that "it is not perhaps the law, as it is in England, that a general promise of security given at the time the debt is contracted may be executed after the debtor has become insolvent. Such a preference will not save the act from being a preference if it would have been one without the promise."

I should feel no hesitation in sustaining a security given in pursuance of a valid promise, made at the time of the advance, to give the specific security afterward executed, but to sustain such security, given in pursuance of a promise in general terms to give some security, would open the door to the very evils which the bankrupt law was intended to prevent. I will not undertake to say whether the prior promise must be in writing or not, or whether, if the advance be made upon the faith of a contemporaneous oral promise to give a definite security, the court might not sustain the security, on the ground that the money advanced was so far a part performance of the contract as to entitle the creditor to a specific performance. But in the case under consideration there was no definite agreement made at the time the notes were given. Mr. Hibbard says: "It was talked up with the company that we had got to borrow some money or get some money some way. They agreed to pass a resolution to give a chattel mortgage for whatever money was borrowed, and they did so." Clearly the "talk" of individual directors is not the act of the corporation. The resolution itself is still less definite. It simply authorized the executive committee to take such steps as they deemed proper for the interest of the corporation, and to protect and secure individuals when they might become liable as indorsers or otherwise. I do not see how a bill in equity could be sustained to enforce such an agreement. To authorize a specific performance the contract should be clear, definite, and unequivocal in all its terms. If the terms are uncertain or ambiguous a specific performance will not be decreed. 2 Story, Eq. Jur. 764–767. The complainant must point out definitely the security to which he is entitled, and not ask the court to determine what security shall be given. In this resolution no property is specified upon which the security shall be taken, nor does it indicate in any way the character of the security. Having advanced the money the creditors waited several months, and until the corporation had become insolvent, before taking the security. Nor does it appear that any creditors were secured under this resolution except these mortgagees, who were not only directors of the company, but members of the executive committee which signed the mortgage. Upon the whole, I have come to the conclusion that the resolution was too indefinite to support the chattel mortgage in question, and that the petition must be dismissed.